### 34064. TUCKER *v.* THE STATE.

CARLISLE, J. 1. Undisputed evidence by the sheriff of the county, the only witness in the case, that, following a two-hour surveillance of the defendant at a house which the defendant rented from a third person and occupied with his housekeeper, he found several pint jars of non-tax-paid whisky in a trap built in an outside toilet on the premises, and that during the two-hour surveillance he saw several taxicabs come to and leave the house, saw several persons· get out of the cabs and go into the house, saw the defendant, his housekeeper, the defendant's brother, and an unamed boy and girl go to the outside toilet, saw the defendant go there three times, saw an unnamed girl go "a time or two", and on one occasion saw the defendant, at his back door, hand a pint bottle of unknown contents to an unnamed person, and that he did not see the liquor placed in the toilet and did not know to whom it belonged, is insufficient to exclude every reasonable hypothesis save that of the guilt of the defendant on a charge of possessing non-tax-paid whisky. *Harper* v. *State,* 85 *Ga. App.* 252 (69 S. E. 2d, 102); *Gambol* v. *State,* 84 *Ga. App.* 293 (66 S. E. 2d, 197); *Rhoddenberry* v. *State,* 50 *Ga. App.* 378 (178 S. E. 170); *Smith* v. *State,* 150 *Ga.* 755 (2) (105 S. E. 364); *Kennedy* v. *State,* 23 *Ga. App.* 141 (97 S. E. 894); *Wright* v. *State,* 25 *Ga. App.* 176 (102 S. E. 834); *Reese* v. *State,* 42 *Ga. App.* 184 (155 S. E. 373); *Roper* v. *State,* 67 *Ga. App.* 272 (19 S. E. 2d, 746). The verdict was, therefore, unauthorized by the evidence and the trial court erred in overruling the motion for a new trial.

2. The error assigned in special ground 1 of the motion for a new trial, upon the solicitor's allegedly improper remarks and argument to the jury, is not likely to recur upon another trial and is not, therefore, considered here.

Pursuant to the act of the General Assembly, approved March 8, 1945 (Ga. L. 1945, p. 232) requiring that the whole court consider any case in which one of the judges of a division dissents, this case was considered and decided by the court as a whole.

*Judgment reversed. Sutton, C.J., Townsend and Worrill, JJ., concur. Gardner, P.J., and Felton, J., dissent.*

DECIDED JULY 16, 1952.

*Bobby Lee Cook,* for plaintiff in error.
*John W. Davis, Solicitor-General,* contra.

GARDNER, P.J., dissenting. I deem it proper to state the evidence of the State in full and the statement of the defendant. R. A. Lyons testified in substance as follows: "My name is R. A. Lyons, and I am the Sheriff of Chattooga County, Georgia. I know Earl Tucker and I saw him during the month of August of this past year. He lives in Snuffeyville on the street running east in front of Homer McKin's residence, in one of Homer's houses, intersecting Roberts Street on the north side. At the time I saw him in August, he rented from McKin and Marie Hunter lived in the house with him and was keeping house for him. As far as I know these two persons were the only two occupants of the house. I have seen Mary Ruth Smithson living there prior to this occasion, and in August, 1951, I made a trip to his house and was accompanied by Deputy Henderson. He carried me to Roberts Street and I came through the pasture to the back of Earl's house and sat down in the weeds adjacent to Earl's house, on the premises east of Earl's house, and watched him a couple of hours or so. That was during daylight, and I saw Earl leave the house and go towards the toilet. I also saw Marie Hunter go out there to the toilet. I saw Earl's brother go out there, and saw another boy and girl go out there. The girl went in the toilet and the boy waited outside the door and I saw the girl go a time or two. I believe I saw Earl go three times, and I watched his car in the back yard. During the two hours I sat in the weeds, I saw several taxicabs come and go and people got out and went in the house. I saw them go towards the front door, but I couldn't see them go in from where I was. On one particular occasion, I saw two people get out and talk at his back door, and I saw one bottle change hands, and it was at his back door when Earl handed the bottle to someone else. It appeared to be a pint bottle and I did not know what was in it. I stayed in the weeds and and after Earl washed his car and put it back in the front they all left. Then I went up there and went in the toilet and got that whisky. I waited a good bit. They had been gone thirty or forty minutes before doing this. I didn't find it when I first went in the toilet and I went out in the road and looked around the house. I then went back to the toilet which was a one-holer and looked the situation over and went back out and got a stick and I reached down through the hole and felt around in there and hit one of those bottles and it clinked. There was a trap behind the two-by-four west of the hole and a trap on the east side of the hole. I took three pints out of that. Those are the pints sitting there on the table that I took out of the trap, and they contained whisky at the time I got them and they contain whisky now. I didn't go to the toilet before I started raking around in it, and I didn't go out there during the time Earl and Marie and this other couple went out there. There are houses on

both sides of Earl Tucker's house and the houses are sixty or seventy feet apart. The house on the east side is a little further away from the house on the west and it is about as far from Tucker's toilet to the other house on each side as the toilet is from Earl's house. I don't know who put the liquor there and I didn't see anybody put it there and I don't know whose liquor it was."

The defendant produced no evidence, but made a statement in his own behalf as follows: "Well, all I can do is relate what he said because I do not know anything about the whisky,—what he told about being behind the toilet. Friday afternoon about four o'clock my brother and a girl friend came to the house in a taxi. We were going to a dance. Friday and Saturday (I guess for a year) I have been going to a dance in Rome. Two girls came from the mill village to go to the dance. They got out of the taxi. I have two brothers. He came in his car. Mine was parked in the yard. We went to the back and washed my car. As far as me going to the toilet three times, excuse the word, but I had been sick, and I don't think I went that many times. We washed my car. Two girls came. There were eight or ten in the house. Some people think because you have company you are doing something you shouldn't. We got the car washed and went in the house. I washed and cleaned up. The jar he was speaking of—I had kerosene in it to wash the tar off my hands. But I had beer in the frigidaire that my brother had bought. We got ready to go. . . The best I remember there were six of us. We went to the dance in Rome. We come back through town between one and one-thirty. There was no taxi. I said to my brother, 'Take me home.' They did. Then my brother went on home, to Pennville. I went to bed. The next morning a neighbor came and said, 'You are in trouble. You had better get out.' I said, 'What do you mean?' He said, 'You are about to get caught.' Again I asked him what he meant. He told me, 'Reuben Lyons stayed over here and watched. After you left he went back to town, then about eight o'clock he came back to Hunt's house a good bit. He and Hunt watched Reuben. Two of them went down in the weeds between his toilet and mine. They found whisky. This man told him it was yours.' I said, 'It is not my whisky. I haven't got anything to do with whisky.' He said, 'Well, I am just telling you, if you want to do anything about it.' I went into the house and drank some coffee. My brother came in and I was telling him. This woman came in telling both of us about it. Sheriff Lyons came in and said, 'Am I about in time for breakfast?' and I said, 'Yes, sit down and drink some coffee.' He said, 'I have a warrant for you,' and I asked him what for. He said, 'You know, possessing whisky.' I told him I did not have any and he said, 'You don't have any now, but I found it last night.' I said, 'What are you talking about?' And he said, 'You know. Go change clothes.' He locked me up. I hunted this Hamblin man up. It was in the weeds between his toilet and mine. I tried to have him subpoenaed to court. He told me what Reuben done. Said he come to his house between seven-thirty and eight and asked if he would bring him to town. He got in the car. He noticed the sheriff had bottles. That was about eight

o'clock. A taxi driver lives on the left side of my house. All the toilets are about the same distance apart. The houses are about what he said—sixty feet apart. They have both got kids four to twelve years old. They have been playing twelve feet from my toilet. People used my toilet like they would if they went to your house and had to use the toilet. But as far as whisky is concerned, I don't know anything about it, and that is all."

It is undisputed and admitted in the majority opinion that the evidence for the State made out a prima facie case against this defendant. The burden was then cast upon him to rebut this prima facie case made by the State. The jury found that he did not do so. The trial court affirmed this finding. When the evidence shows that contraband whisky is found on premises, the presumption arises that the owner knew it was there and that it was his possession. With this same question under consideration this court in Acker v. State, 78 Ga. App. 819, 820 (c) (52 S. E. 2d, 559), stated: "When the State established that the contraband whisky was found on the premises of the defendant, he being the head of the house, the presumption arose that he knew that the whisky was there and that it was his possession. This was a rebuttable presumption. The jury were authorized to infer that the defendant did not rebut it. See Bollen v. State, 53 Ga. App. 359 (185 S. E. 837); Morris v. State, 51 Ga. App. 145 (179 S. E. 822)." The evidence in this case beyond dispute, either by the evidence or the defendant's statement, shows beyond peradventure that the whisky was found on the defendant's home premises in a trap within his toilet. The evidence shows that the defendant lived in this house with a woman who cooked for him. She was his servant. The jury were authorized to find from the evidence and from the defendant's statement that he had exclusive control of the premises. By reference to the evidence it is found that the officer testified that he concealed himself during daylight hours, near the toilet; that he saw Marie Hunter, the servant and agent of the defendant go out to the toilet; that he saw the defendant's brother go out there and another boy and girl go out there (meaning to the toilet); that the girl went into the toilet and the boy waited outside; the girl went a time or two; that the defendant went to the toilet three times; that the officer sat two hours in the weeds on watch; that during the two hours the officer sat on watch he saw nearby several taxicabs come and go and people got out and went into the house; that these people went toward the front door of the defendant's house; that during this watch two people got out and talked to the defendant at his back door and the defendant handed a bottle, apparently a pint bottle, to one of the people who came there. It will be noted that the defendant finished washing his car back of his house and carried the car to the front of his house and then he and his brother and the other visitors and his housekeeper left the premises for a party, whereupon the officer went into the toilet of the defendant. At first he did not find any whisky visible in there, but he went out and procured a stick, took the stick and returned to the inside of the toilet and reached down through "the door" and found three pint bottles of non-tax-paid whisky, which bottles were introduced in evidence. The officer testified: "There was a trap behind

the 2 x 4 west of the hole and a trap east of the hole." In a trap the liquor was found. The brother of the defendant and his lady companion evidently were guests of the defendant. There is no intimation as to the names of the persons who visited the defendant's house on this occasion in taxicabs.

I can not by any reasoning reach the conclusion that this evidence rebutted the prima facie case that the State established by evidence. Certainly the jury had a right to disbelieve the statement of the defendant. They did just that. It seems to me that the majority opinion abrogates and obliterates the principle of law regarding the presumption which arises against a defendant when contraband whisky is found on his premises. I have read many decisions and I fail to find any case where the appellate courts have reversed a jury finding under facts similar to those in the instant case. Certainly the cases cited in the majority opinion on which the reversal is based do not justify the reversal. The facts in those cases are not at all similar to the facts in the instant case. I think that the case should be affirmed.